The City of Shreveport, L.L.C. Mr. Hughes Yes, Your Honor. You may proceed. Good morning, Your Honors. Edward Hughes on behalf of Vivint, Louisiana, L.L.C. at Pleas of the Court. We believe we have a simple proposition for you today. Whether blanket prohibitions of door-to-door solicitation in the purely commercial context are an unconstitutional abridgment of commercial speech. We believe this is a de novo review given the Baby Doll Topless Saloon case decided by the Fifth Circuit in 2002 where abridgments of speech, constitutional free speech, are mixed questions of law and fact. Because of that de novo review, the starting point here is the Central Hudson analysis. Right off the bat, under Central Hudson, for purely commercial speech to deserve constitutional protection, it must concern a lawful activity and not be misleading or be truthful. We believe that the City of Shreveport has effectively conceded in not presenting evidence that everything that we've done is a, quote, lawful activity, well, proposed to do as a lawful activity, and it is not misleading. Since that is the case, the speech is entitled to constitutional protection under immediate scrutiny. In this case, as Shreveport has conceded that Viven is involved in lawful non-misleadings You said immediate scrutiny. Intermediate. I'm sorry. Intermediate scrutiny. Intermediate scrutiny. I will get to that, Your Honor. I still don't know what it means, but I know the word that gets used is intermediate. Central Hudson actually provides a framework for what intermediate scrutiny means. But the bottom line is cities are fully in their right to regulate commercial speech. Certainly. You just have to follow this fairly nebulous loose standard. So here's my problem with your position. You know, factually, when I look at public statistics, Shreveport looks at about 2,000 residential burglaries a year. So they have, that's 2015. Um, so given that substantial interest to stop thousands of burglaries into homes, um, we've got a appellate state court that said this is a fine ordinance. We've got the Louisiana Supreme Court, the U.S. Supreme Court, Breyer and Cunningham, admittedly pre-Central Hudson. And then we've got the people of Shreveport for 30 years saying they want this. So we'd be a federal court stepping in and overturning a state Supreme Court, arguably intentional of the U.S. Supreme Court, clearly contradicting a state appellate court and absolutely contradicting the will of the Shreveport people. That's a very big request you're making of us to do. Well, Your Honor, I believe the duty of the federal courts, especially when you're dealing with a nonpolitical body, is to protect the constitutional rights and the freedom of speech of those for whom they deserve protection. We are not saying, again, that there is no basis for regulation. In fact, we proposed a— Your argument, as I got it, is largely indexed on the pervasive strain of First Amendment jurisprudence which Justice Black put forward in protecting the home. And you start from that base itself. And secondly, that there's no deprivation of alternative means of—but here, there's been no deprivation of alternative means of communication. That is, your argument is that this regulation has to—this prohibition here has to come down under the—for the reason that largely because it steps on the privacy interest of the homemaker. Is that correct or not? That is certainly one of our arguments, Your Honor, I believe, to jump ahead and— Wait, your argument is—your argument against this ordinance is based on the privacy interest of the homemaker? That is one of the arguments, is that the—and I believe the Edenfield case, I could be mistaken, but the—yeah, the Edenfield case notes that the job of determining whether you want to receive information is that of the speaker and the audience, not the government. So that is one reason. What's the best central Hudson case that strikes down one of these, because there are a lot of cases out there, based on the homeowner's interest in receiving the solicitation? What case can you point to? The homeowner— As opposed to your client's interest, the speaker. Edenfield— I know they talk about that as a value, but do you have a single case that struck it down, focused on—  The Metro Media case, to some degree, is a realty case. The difficulty, in part, with your argument is that one of the difficulties is that the notion of paternalism that the state undertakes to provide a—to protect the homeowner from the—for making these—takes away from the right of the homeowner to decide whether or not to open the door and to answer that. So that's a paternalistic strain, which the court has said is very strong. In other words, you can't try to shut down advertising in casinos to keep people from gambling, but to try to protect the people in that sense. You follow? You're saying that you can't shut down advertising? Well, I'm suggesting to you that the—well, I'll just let you make your argument. I have a moment to talk about that. I will, too. Certainly, you know, the substantial state interests, I think they're legitimate in theory. I think if we go down the line of privacy, nuisance, crime prevention, in this case, the statute enacted in 1971, and with crime stats in 1990 and the R-173, the Deputy Huddleston's affidavit, he began working there in 1984. I don't think anyone—besides the fact that anyone can testify as to what the intent of the statute was, except for the actual statute, which says nuisance. It says nothing about crime prevention. That's an after-the-fact creation, using effectively the rationale used in Edenfield, which I found striking because Edenfield was reversed, but using the affidavit of the other—of a state actor, I guess you could say. Just as an aside, let's not forget that Viven is actually selling home security and automation systems. Which prong do you win on best? It doesn't directly materially advance privacy or safety, or there isn't a perfect fit? I know you're going to say both, but which one do you think there's more authority out there supporting? I had—well, I think there's more authority on the reasonable fit. Judge Higginbotham's case in—well, not—of course, admittedly, not a door-to-door solicitation, but where one must use—the State must use the— The least restrictive means. No, no, no. We've been trying to be pigeonholed. A less restrictive means than banning the specific action altogether. Edenfield—there's a lot of case law. Edenfield says blanket bans are unconstitutional—I'm sorry, are disfavored. Another case that effectively was—the ruling was upheld is the Wentforth case, cited by Judge Higginbotham, that they upheld the ban on attorney solicitation, but it was a 30-day ban. We are not sitting— The best case is the Supreme Court went for it, and Judge Higginbotham's author decision in Pruitt— And Edenfield. Edenfield sets the framework for all of these things. Frankly, when I started this case, I thought there would be a case on all fours, but there's just not a lot of door-to-door solicitation cases in the Fifth Circuit. There aren't any all fours in the First Amendment. Well, you're right, Your Honor, but I thought there would be some closer. But factually, you know, if you look through the cases here, there's time, place, and manner restrictions. One point I wanted to make is if you have these—so cities and municipalities and parishes and counties around the country have these restrictions on the ability of door-to-door solicitors to do their business. Time, between 9 and 5, you have to wear an ID. We referenced Bossier Parish just to show there are less restrictive means, not to show that they had to do this. Now— What do you do with the cases that say that even with not commercial speech, but the highly protected speech interests of handing out literature, that the cities can't regulate that because they—in the sense that you shouldn't make the decision for the cities as to what the individual—as to whether they want to receive or not, or turn it around the other way, it is no burden—no burden is imposed upon an individual to open the door and say no. There's not, and there's nothing wrong—I believe the case law states that there's nothing wrong with having a no solicitation sign on your home, and a city would enforce that ordinance. I think the point would be is why have time, place, and manner restrictions for commercial speech, okay? If a blanket ban is okay. But look, but this is focused primarily on this ordinance. What we're dealing with is a prohibition of a particular type of product that's being solicited, correct? No, Your Honor, it's— I know you have a product, though. There are some exceptions. There are some products there, yeah. Excuse me? I thought we were talking about the solicitation of—for home security systems. No, this encompasses any and all people who are soliciting— Well, I know that's the ordinance. That's been in place for a long time, but you're engaged with a company that wants to go door-to-door and sell to— Home security systems, that is correct, Your Honor. Okay. The—Well, as applied to them, why isn't it reasonable to conclude that that— Well, I don't know. If your home security says a guy going door-to-door, I'm a solicitor. I might very well be very concerned if I've got a lot of burglaries and things going on. If I'm knocking on the door, let me get to—let me case your house for security reasons. And so I'll know all the security interests and so forth. And that's a risk. And why can't the city respond to that? The city can certainly respond. In fact, what we say is the city can make anyone selling home security systems wear uniforms. Anyone go through a background check, just like Bossier-Paris, provide that back—fingerprinting. No convicted felons. No one who—all of these are things that the city can do. But so the case law at Central Hudson says it must be narrowly tailored. How can a blanket ban be narrowly tailored? And that is the question. If the dictate is that it must be narrowly tailored, then what they have done is not use a less restrictive means. They've used the most restrictive means. So your position is any city anywhere in the country that has a 24-hour ban, that's unconstitutional? That is—well, yes. That would be a big decision for the Fifth Circuit. It would, Your Honor. It would. But how could you have a less restrictive—how could you meet a less restrictive test when it's a blanket ban? It isn't perfect. It's just reasonable. Is it reasonable to think that fewer strangers will come to people's doors at night if you say that some subset of strangers aren't allowed to ring the doorbell? Why isn't that reasonable? Well, Your Honor, I would—I'm not saying that that— The test is reasonableness. I'm not—well, I'm not saying that position is unreasonable. What I would say to that is making criminal lawful activity in order to expose the light of day to the criminals is not reasonable. And I believe that's, in effect, what they were trying to do, to the extent they can. I'm sorry. What post-Central Hudson was? What year? 2015? Central Hudson was 1980. It was—yeah, 19— Do you know of any post-Central Hudson case that's upheld a blanket ban on door-to-door solicitation? Any circuit-level case that hasn't given the relief that you're asking for? In a door-to-door solicitation, in a purely commercial context on a circuit level, I don't believe, Your Honor. Is Congress doing this for telemarketers, or is Congress doing what you're saying, tailoring? Congress is tailoring it for the TPCA, for Do Not Call Us. They have a procedure, I believe. One of the problems is, is that the Metro Media case involving Billboards says that each method of free speech is a law in and of itself, or unto itself. So you evaluate each one. And that is the problem we get into here. But, you know, when you go through the line— If the people of America said, we don't want telemarketers calling, and Congress responded and said, that's right, blanket ban, no calling, that would be unconstitutional. I believe so, Your Honor. That's an identical parallel, yes or no? From the privacy interest standpoint, they are— I think that's an identical parallel. Personal opinion, I don't sit where you sit, but commercial speech is protected. We are past Braillard. We have gotten the Virginia board. We now have Central Hudson, and commercial speech is protected. Yeah, well, that's a lower level of protection than political. It is, Your Honor, but it's not rational basis. No. And some cases—I hate to be, you know, a nerd out on it, but some cases kind of indicate that when it is a constitutional—I guess Central Hudson says that it could have a higher level of scrutiny, but I think— But it's not strict scrutiny. No, no, Your Honor. You're out of time. Thank you, Your Honor. All right. Thank you. Okay, you're going to nerd out on this, aren't you? Judge, I'm going to do my best. I know that there's a lot of cases here that you can easily get bogged down in. Is there any circuit case post-Central Hudson that allows a blanket ban on door-to-door search? There's not. That's—and then when I looked at the cases you cited, page 22 and 23, to suggest there don't—what's it, the Tenth Circuit case you cited, Pacific Frontier, that upheld a preliminary injunction, correct? Correct. And then the Third Circuit case you cite, Pennsylvania Alliance, that was tailored to nighttime only. So it looks to me that Central Hudson is a huge turning point, and we don't have a single blanket ban being upheld anywhere after that, except in Ohio Circuit-level court. And then, you know, the Louisiana court, and then there's a Colorado State Supreme Court case. A Colorado State Supreme Court, post-Central Hudson, not 24-hour ban? Correct. It's a—it was the town of Fort Collins, I think. Okay. That's interesting. So you're saying if we rule otherwise, we've created a split with the State Supreme Court? That's right. That's— Colorado. May is the name of that case. Okay. I'll look at that, because the Court of Appeals here, Brunel, I mean, wasn't very rigorous analysis, in my view. I'm sorry, which— Well, let me phrase that as a question. Here, is it true the district court only gave one paragraph of analysis to the directly, materially advances, the two interests you've identified? You know, I know that he addressed the evidence. I don't think it was that much detail. It was one paragraph. He cites Hudson twice, both relating to crime. There's no finding that I saw that he made or Hudson asserted relating to privacy. And that's—I think the court probably referenced it, but just briefly. Okay. So that puts us in a position, given our authority, Pruitt and the Supreme Court went for it. These cases, they're saying cities at least have to give a rigorous analysis to how a blanket ban on commercial speech directly and materially advances it. You've got to look at it. But here, we've got one deputy's statement that it helps community policing. Right away, you've got a glaring problem that he starts 20 years after the ordinance has been passed with a high point of crime, which doesn't at all suggest that this ordinance helps reduce crime. Well, if you look carefully at what he's addressing— Yeah. —it's at a period of time when Shreveport started using a community-oriented policing that was different than it had used before. And it was to address some pretty intense criminal activity— That's true. —that was happening in this community. No one's questioning the value of community policing. The issue is this ordinance. And he hardly explains how it connects to community policing. He explains that one of the major features of the community-oriented policing program was getting these neighborhoods vigilant on these door-to-door robberies, these break-ins, home invasion robberies, and that the presence of this ordinance—and he's observing it after 20 years of criminal statistics for 20 years—that was 20 years as the deputy chief and the assistant chief of police, a pretty unique vantage point. Oh, I agree. He's got the qualifications to say community policing is essential. The trouble I don't see is any statement saying this ordinance, which was enacted in 1971, but you have a high point of break-ins in 1990. It doesn't look like it's what's doing it. And then if you really try to think through it logically, it gets even more difficult, because if we're assuming a bad guy and you've got an ordinance that says, well, if you're selling maw mowers or if you're selling services or you're selling all these other things, you're fine to go to the door, but not if you're selling these. Eggs and milk. It's the Louisiana exception to the First Amendment. Eggs and milk, I think. Well, in 1971, I didn't think it was that pertinent, but I wanted to go ahead and address it now that we're thinking. This ordinance was addressed by the Louisiana Supreme Court in the 30s, and it was then addressed. So the 1971 date, I think there was some renumbering in the, maybe when the charter changed or something like that. This ordinance has been in place for a lot longer than that. The Alexandria ordinance is the same one in the Breard case. But the problem is, for us to do central Hudson, the Supreme Court went for it, upheld a narrowly banned 30 days only using two-year studies, complaints, hearings, et cetera. But here, the district court took an affidavit about community policing, no legislative findings, no hearings, no complaints. It's just one affidavit, one paragraph of analysis, and that's enough? Well, it's at the summary judgment record also. I mean, there's not an effort. There wasn't a Rule 56D motion to hold the record open and go depose him and get more. There wasn't some discovery effort to try to get more details. We have a truthful affidavit of somebody with personal knowledge for 20 years of looking at weekly crime statistics, and I think that's adequate. What's your best case for that being adequate? When he talks about a bad crime problem, there is no doubt Shreveport has a residential burglary problem. All major cities do. But he says that we're fighting it with community policing. That doesn't, to me, speak at all as to how a door-to-door solicitation with a whole bunch of exceptions ties into helping people do community policing. Now, Judge, the exceptions that it's referencing, it's historic. It's eggs and ice and things like that. There's not something that says if you have other products that you want to sell that you can just go sell at will. Under Central Hudson, it says we must determine whether the regulation directly advances the governmental interest asserted. That's what we're talking about now, right? Well, that's the second step, correct. And I think that the affidavit... And that's what that affidavit goes to? Is that what you're saying? That's included. It does both. It shows that obviously advancing public safety issues are clearly appropriate interests. We know that. Right. And I would say that the interest could even be described more narrowly here as well in that he's talking... That's whether the governmental interest is substantial. Let's assume we agree on that one. So now let's go to the next one. Determining whether the regulation directly advances the governmental interest. And I think that the... What supports that finding? The support would be the observations of the Deputy Chief for 20 years on the fact that they started getting communities to be vigilant about what's happening in that community, who's moving around where, and that there's not... And this regulation does that? This regulation accomplishes that? It does go towards that. I mean, there's not a lot of people who aren't part of that neighborhood going door to door that desensitizes, I think, how he described it. The citizens know what's happening in their communities when you have extraordinary criminal activity here that's not the same as the Idaho Falls, Idaho. That's a different case. You have to look at the summary judgment record for this particular community. Now what was... I think that for summary judgment purposes, and that's really what this case ought to be decided on, is summary judgment record... Judge Hicks abuses discretion in accepting that evidence. It's your burden. I understand. And we advanced our burden for purposes of summary judgment. That's an appropriately accepted affidavit. He described it in the opinion. It's based on that person's observations personally. It would have been admissible at trial. But the question is whether or not the statute here has been narrowly tailored under Hudson. There's a lot of cases that followed after Hudson. I understand. In this particular set, I mean, we're looking at a reasonable fit. I can't think of other... But this is a complete ban, though. The difficulty is the ordinance comes early in the game, long before the... Really before the commercial speech really got so well developed. Because I don't remember the date of that ordinance, but it's read like an old ordinance. How long has that ordinance been on the books? I think we have difficulty with the records on that, Judge. It's probably in the 30s is what we think. Yeah. Well, long before. I mean, commercial speech came on much, much later. But this whole development in First Amendment jurisprudence and narrow tailoring, it's probably at the heart of that ordinance. It bans all the solicitations except for these local interest groups. But I saw no narrow tailoring there. Can you point to any? I mean, I understand that you got a problem out there. But you now see it. But you didn't adopt an ordinance that was backed by findings that this particular type activity is intended by criminal conduct, et cetera, et cetera. And you respond to that thing. You had a blanket ban that's been out there for the 30s. And you come along and then this problem comes up and you apply that ordinance to it. Now, that's the difficulty I'm having with your case. I'm sensitive to the interest, state's interest here, the county's interest, the government interest here in protecting homeowners for this particular type of inquiry. The difficulty is that in responding to that, you have to do it in your ordinance. Your ordinance doesn't do that, or does it? I can't see that it does. It bans everything. The fact that when you have, particularly in more difficult neighborhoods with more crime, that they depend upon the neighbors and the neighborhood to know who's doing what and what are they up to. And the home invasion burglaries and things like that are a pretty serious issue. It's unique, perhaps, to that community. It's something that this person observed over his 20 years. When they started emphasizing this ordinance was important, as he describes it, to the community-oriented policing because it enabled the citizens to know who's coming where. Now, I just don't, I still don't, it has to directly, materially advance this ordinance. Okay, so here's just, maybe this has been a record or not. How many people are arrested and prosecuted for the unlawful solicitation in 3.0? If this is a big problem and a threat to the security? Do we know that? Is that in the record? It's not in the record. I can't imagine that there's, I mean, it's known that they have this ordinance in place. I know, but therefore, if this is the big crime-fighting measure, how many people get convicted, prosecuted, arrested for ringing the doorbell, either as a fake or true salesman? I think it's because the community knows that they're not out there selling fire extinguishers or... But so you would, would a girl, I mean, I don't, this is not a trite question. Would a Girl Scout trying to sell cookies be criminally exposed? No. Why not? It's just, it's not, they're not, I mean, that's a charitable organization. There's an exception in here for charitable organizations? It's not specifically there, but it's not going to be enforced. That's the problem. It's not going to be enforced against certain people. Is technically under the ordinance, could a Girl Scout be prosecuted for ringing the doorbell saying, would you like to buy my cookies? Yes or no? Under the ordinance. As that ordinance is written, it could. Yes. Whereas a group of lawn service people coming in saying, could we go around your yard and mow it all? They aren't prosecutable, correct? No, they would be. I thought services are exempted. No. Are you sure of that, counsel? I mean, that's... Well, it's the people with milk, eggs, and other stuff that people brought around in the 30s. That's what's exempted. No, well, I may be wrong, and so you can be just as emphatic as I'm being with you. I thought the sale of services is accepted, services broadly. Are you sure the answer is no? I mean, I'm sure. I don't have... Okay, you're sure. If you're wrong, and therefore people can come and ring the doorbell, a crowd of people that are coming in saying, we do your lawns and trees, if they're exempted but the Girl Scouts aren't, this still goes to crime fighting? It still would have an effect on that. It's going to lessen the number of folks moving from door to door. That's the bottom line. Anything that lessens the number of folks. That's part of it. It's several-fold. That was one that was a little different. The fact that the folks know who's coming door to door, who's going to be... There's less of a chance for these folks that aren't good... On your theory, applying Central Hudson, if a substantial interest is tranquility and just stopping blanket bans, doorbells ringing, why wouldn't Congress be able to say to telemarketers, no calls ever, on your theory? Wouldn't that survive a Central Hudson? I think it would. So Congress can say, telemarketers, commercial speakers, you can never call anyone in the United States, because that will disturb their tranquility, and that's a reasonable fit. That's your theory. I mean, I'd have to go back and look at it a little more. Yeah, but it seems like the logic of your argument. It wouldn't be illogical to suggest that that would advance that interest. Right. That's my point. There's obviously less intrusive ways to do that. Well, the telemarketers are heavily regulated and tailored, and the courts have sorted those out. The Tenth Circuit and Judge Wilkinson on the Fourth Circuit, the lead opinions that spell out the telemarketers. And they are upheld under commercial speech, but they're under severe restrictions in their tailoring. And so I come back to what I said to you before. I think you've articulated a strong interest, both in privacy interests and in protecting home. The difficulty is that you can't use a global ban out there. And your global ban suffers from the fact that it's a global ban in the sense that it happens to exempt, have some exemptions in there that travel their intention with your service of interest itself. There's nothing that suggests that people come forward to sell milk and eggs aren't also, may be imposters. I mean. Obviously, that's possible as well. I think that the reasonable fit analysis gives room for all that. I don't think that at this point a curfew, I suppose, could help. I guess it's probably more likely in the day that these things. Well, that would be yes. I think you'd be in a very different world if you had a nighttime ban. But there's just not. That's what telemarketers went to. I mean, you can't have calls in their new stated periods of time, et cetera. And they balance out the interest. Well, there's no authority that suggests that that's required. I mean, the fact that. That's what we upheld in Pruitt, based on common sense, which is. Right. Cities win there. Well, the issue here is on this summary judgment record, consider that affidavit and accept as true what his observations are about how there is a relationship between community policing and this type of activity that the knowing who's coming and going in a way that limits to some extent, not entirely. I mean, yeah. Does it advance the interest to the point that you could say it's a reasonable fit? We don't have to show that. You've made a very strong case for community policing. I just don't see Huddleston connecting policing to an ordinance that says no Girl Scouts, fine law service, if I'm right on that. If well, you look at that. I think we satisfy our burden when we provide that type of affidavit. He's got his personal observations of it. I'm not sure what other evidence that won't mean anything. He says personally observing how restricting doorbell ringers salesmen instead of just this will somehow make people more vigilant and it'll desensitize. Whatever the word is that he said, I don't even understand how the desensitization works. What did Huddleston say about the restriction on soliciting as opposed to the value of community policing? What is it to quote me anything that he says about that? I think he also said that there are confrontations between citizens and persons who are coming to the door and if they don't know them in particularly these bad areas that are having such problems and we're trying to improve that it leads to escalations of problems. I think he talked about that as one of his observations. That would be a legitimate reason as well. I'm not saying they're illegitimate. I just think there could be a lot more evidence the city could do for a blanket ban to say we're prosecuting a lot of people that pretend to be salesmen. We arrest them. We get calls from people. It's happening. None of that's here. But all the post central Hudson cases have exhaustive complaints and hearings and they demonstrate the facts. Well, in respect to circumstances where that's more possible, I mean, they're not cases that talk about these issues in any of the cases relative to the law enforcement. We have Judge Rink was talking about it in one of his dissents about how it's common sense all of this and we've been talking about it in Supreme Court cases for a long time about the relationship between criminal activity. That was what, you know, that's a big part of all these. So my point, I think, is that when you have an affidavit from someone who's qualified to talk about it as personal knowledge of what he's observed for 20 years in a unique setting, in a unique community that's having particular problems, and that they associate this vigilance in the community, the lack of things that may be fine in Idaho or somewhere else that are potential problems here, he's able to observe that. It satisfies a summary judgment burden. Either there's a per se ban on these things entirely, that you can't have a 24 hour ban for safety reasons or you have a trial and let's go back and see exactly what he really meant. That's the two options here, I see. And as to the latter, I don't think that that, I think that's ignoring the summary judgment record in this particular case. It's not much of a record, but that we can agree to disagree. I mean, the state fire marshal in Louisiana is backing off. The attorney general is backing off. That makes a really important case for Shreveport government authorities to say Shreveport is unique and different, our problem is outrageous, and this ban on solicitors will help our crime problem. I'd love to see facts with that level of grit and granular truth justifying a blanket ban. Well, I don't believe that that's necessary on a record like this when there's nothing contravening what we have in its admissible testimony. Yeah. Thank you. Rebuttal. Am I right or wrong on services? You're right, Your Honor. It doesn't specifically exempt services. Specifically, though, it says that what is banned is this peddling for the purpose of soliciting orders for the sale of goods, wares, or merchandise or disposing of goods, wares, or merchandise. We have, I think we said that in our brief, the lawn mower, the Scott's Lawn Chemical guys, although arguably that could be a good... Is there data on arrests? I mean, or do they... There is none. So certain people that look okay coming to the door sale just don't get arrested, but certain other people do. Well, I think here everyone would be arrested. Girl Scouts, anybody. Girl Scouts, Your Honor, I actually thought about putting that in the brief, but I decided against it because I think they have a higher level of scrutiny when it's a charitable organization. But under that statute, they are certainly addressed. Kids going door to door selling popcorn, which my kids like. Yes. The statute, as in its... Well, I'm sorry. Edenfield says that you cannot rely on an affidavit which just provides mere speculation and conjecture. Cherry picking a 1990 and a 2014, while those stats may be right, it provides zero context, Your Honor. In addition, there is no link between door to door solicitation, I think you touched on it, by Deputy Huddleston, and any reduction in crime. It's just this... In fact, it's indirect because it doesn't directly advance, to the extent it's even true. We don't accept that affidavit. But it would arguably indirect because it's part of this community policing regime, I guess I would say. I think the do not call list is, with regard to telemarketers, the perfect parallel to that is the no solicitation sign. Certainly, any other restriction, for instance, the time restriction is clear. Certainly past constitutional scrutiny. I'll also note that the Oregon Supreme Court struck down a very similar ban to this. So... What about the Colorado? I didn't... The Colorado case has a pretty vigorous dissent. But otherwise, it was a blanket ban and it applies to Central Hudson? I wasn't aware that ruling for you would create a split with the state highest court. It does apply. It applies Central Hudson. Oddly enough, it doesn't apply Fox, which makes the ruling even more striking because Fox said in this reasonable fit, less restrictive. If you recall, Central Hudson began with a least restrictive means. And the Colorado case is 1981 and addressed Central Hudson even under a least restrictive means. I can't justify that. I think that's part of the reason for the dissent, Your Honor. It's not a complete ban in the sense that it bans an entire medium of expression in the First Amendment sense. It is a complete ban in another sense. I think we're all using the term complete ban and not in the sense of a complete ban of a medium of communication. Because there is no ban on all communications. And there are other means to reach these households. So there's no foreclosure here by the ordinance of a medium. There is a vital distinction between that and... Well, I grant your point, Your Honor. Although to that, I would say Metro Media, which is, I think, in the city of Los Angeles, which stem basically kind of begin this alternative means, that was never, under a Central Hudson analysis, never the reason why a ban was upheld or restriction was upheld. It's always been kind of a throwaway. And if you look at the Lindmark case, which is admittedly pre-Central Hudson, it kind of goes into, you know, banning for sale signs in a neighborhood because of white flight issues in the 1970s. And that was struck down. And they did, one of the reasons they said was this alternative, they stopped this inquiry into the alternative means of communicating their ideas because, or their commercial speech, because they, how else are people going to sell their signs? You know, the captive buyers driving throughout the neighborhood. And that does kind of bear upon us as well, Your Honor. We don't sell to... There's a facial attack on the ordinance. It is, but I do want to note that it does bear upon how we market. We're not going to go, first of all, in this age of cell phones, how are we going to call, right, this blanket call? And second, I'll finish up. We don't sell to apartments. So this, I take your point, Your Honor, but I don't think that's a reason. The point is simply, you have to maintain it as a facial attack because as applied to you specifically, you have a problem. Certainly, I did want to address the alternative means of communicating that idea. The other way of looking at the failure to Darrelly Taylor is you end up with an overly broad statute. Thank you. Thank you, Counsel. That concludes oral...